

FILED
SEP 23 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____cp_____ DEPUTY

LAURA E. DUFFY
United States Attorney
PHILLIP L.B. HALPERN
California State Bar No. 133370
EMILY W. ALLEN
California State Bar No. 234961
Assistant U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9738
Fax:       (619) 546-0450
Email:     phillip.halpern@usdoj.gov
           emily.allen@usdoj.gov

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No.: 14cr2702-BEN |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | INFORMATION |
| ZEEV HECHTER, | ) | |
| Defendant. | ) | |

The United States Attorney charges, at all times material:

SECONDARY MORTGAGE MARKET FRAMEWORK

1.  In the United States, residential mortgage lenders typically sell the loans they originate to third-party investors, to the Federal National Mortgage Association (known as "Fannie Mae"), or to the Federal Home Loan Mortgage Corporation (known as "Freddie Mac"). By selling these loans, lenders reduce their credit risk and gain access to additional capital, which in turn provides borrowers with greater access to mortgage loans. This secondary mortgage market exceeds $10 trillion, and is essential to the healthy functioning of the American housing market and the American economy.

2. Secondary mortgage purchasers often combine the loans they purchase into what is known as collateralized mortgage obligations ("CMOs") or residential mortgage-backed securities ("RMBSs"). CMOs and RMBSs are then typically re-sold to institutional investors such as pension funds and insurance companies. These products are then also often combined into ever-more complex collateralized debt obligations ("CDOs"), which may include other types of debt obligations such as corporate loans.

3. This form of mortgage securitization provides increased capital because the risk of default is, in theory, greatly reduced by the aggregation of large numbers of mortgage loans, allowing even high-risk individual loans to be categorized as "safe" investments when they are pooled together.

4. As a result of the secondary market securitization of mortgages, the connection between borrowers and lenders has weakened, as loan originators no longer have a direct stake in ensuring that individual borrowers can repay their loans. As a result, secondary purchasers, who bear the risk of default, heavily influence lending standards. As mortgage loans are re-packaged and securitized, collateralized, and re-sold into products seen as "safe" investments, those lending standards deteriorate. The resulting complexity of mortgage securities products, the lack of regulation and ratings standards, and the abundance of credit availability are often cited as the causes for the financial collapse of 2008.

<u>BACKGROUND ALLEGATIONS</u>

5. From approximately 2006 until 2014 ("the relevant period"), Defendant ZEEV HECHTER's son, I.H., operated businesses in San Diego, within the Southern District of California, including Note Tracker

Corp., Nationwide Servicing Center, Ocean 18, LLC, and Instant Mortgage Lending.

6. Through his businesses, I.H. participated in the secondary mortgage market. I.H. purchased primarily distressed and non-performing notes from primary lenders, and serviced the loans by collecting payments from borrowers. I.H. pooled these loans and sold shares of the pools to investors, primarily friends and family. The companies' investors would collect returns when borrowers made monthly payments, paid off their mortgage loans, or after foreclosure on the real property collateral.

7. Beginning in approximately 2006, ZEEV HECHTER began participating as an investor in I.H.'s companies.

8. During the relevant period, I.H. and his companies purchased mortgage notes from, among other lenders, GMAC Mortgage, LLC ("GMAC," now known as Ally Bank), a financial institution insured by the Federal Deposit Insurance Corporation.

9. During the relevant period, Robert Moreno ("Moreno") (charged elsewhere) worked at GMAC as a Market Manager. As part of his job, Moreno sold mortgage loans to third-party investors, including I.H. Some of these loans included distressed or non-performing second mortgage notes, where the first mortgage notes secured by the properties were held by Fannie Mae or Freddie Mac. GMAC sold the notes to the highest qualified bidder after distributing lists of the loans offered for sale.

## COUNT ONE

## 18 U.S.C. § 371

## (CONSPIRACY)

10. Paragraphs 1 through 9 are realleged and incorporated by reference herein.

11. Beginning in or around early 2012, and continuing through at least in or around March 2013, in the Southern District of California, the Southern District of New York, and elsewhere, defendant ZEEV HECHTER did knowingly and intentionally conspire and agree with I.H., Moreno, and others known and unknown to commit offenses against the United States, that is, Bank Bribery, in violation of Title 18, United States Code, Section 215, and Tax Evasion, in violation of Title 26, United States Code, Section 7201.

### Purpose of the Conspiracy

12. It was the purpose of the conspiracy that ZEEV HECHTER, I.H., and others would corruptly pay Moreno cash and other things of value in excess of $1,000, with the intent to influence and reward Moreno in connection with the business and transactions of GMAC. Specifically, Moreno would provide inside information about GMAC's sale of mortgage notes so that I.H. and his investment companies would gain an unfair competitive advantage in purchasing those mortgage notes from GMAC. In return, ZEEV HECHTER, I.H., and others would make personal payments to Moreno, which were paid in cash and otherwise concealed from the Internal Revenue Service ("IRS") to assist Moreno in evading federal income taxes on the illicit income.

### Manner and Means of the Conspiracy

13. To further the criminal conspiracy, ZEEV HECHTER, I.H., Moreno, and other co-conspirators utilized the following manner and means, among others:

   a. Through his employment at GMAC, Moreno would sell batches of distressed mortgage loans to investors, who submitted bids to GMAC for each purchase. Moreno would gain access to bid information from each competing bidder, and to information about the loans offered for sale.

   b. Moreno would corruptly accept personal payments from I.H. and his associates, including ZEEV HECHTER, and, in return, would ensure that I.H.'s bids were accepted by GMAC.

   c. ZEEV HECHTER, I.H., and others would arrange to pay Moreno in hand-delivered cash payments and other methods designed to conceal the payments and to avoid reporting the payments to the IRS.

### Overt Acts

14. In furtherance of this unlawful agreement, and to carry out its objects, the following overt acts, among others, were committed within the Southern District of California, the Southern District of New York, and elsewhere:

   a. In or around early 2012, I.H. agreed with Moreno to pay bribes to Moreno in return for Moreno's assurance that I.H.'s bids to purchase mortgage notes from GMAC would be successful.

   b. Following their agreement, I.H. explained the arrangement to ZEEV HECHTER, and asked if ZEEV HECHTER had cash available to pay Moreno. I.H. told ZEEV HECHTER that Moreno

required cash because he did not want to pay taxes on the unlawful payments. ZEEV HECHTER agreed to deliver cash payments to Moreno.

    c. I.H. provided Moreno with ZEEV HECHTER's telephone number, and Moreno called ZEEV HECHTER to arrange a meeting time and place in New York City, near ZEEV HECHTER's home.

    d. In or around early 2012, ZEEV HECHTER and Moreno met on a New York City street corner, where ZEEV HECHTER handed Moreno a bag containing $20,000 in cash.

    e. In and around 2012, ZEEV HECHTER met Moreno several more times to deliver cash payments, including on street corners, at ZEEV HECHTER's home, and at ZEEV HECHTER's business.

    f. By approximately mid-2012, ZEEV HECHTER had paid Moreno a total of approximately $80,000, and he ran out of cash. In or around July 2012, ZEEV HECHTER obtained an additional $250,000 in cash from his business associate, which he used to make additional payments to Moreno.

    g. ZEEV HECHTER repaid his business associate by writing five post-dated checks for $50,000 each, which his associate deposited between September 2012 and March 2013.

    h. Following ZEEV HECHTER's payments to Moreno, I.H. reimbursed ZEEV HECHTER through payments from Note Tracker or another of I.H.'s companies, with the note "Return of Investment." In fact, these payments were not returns on investment, and that note was designed to conceal the true nature of the illegal payments.

    i. In total, during the relevant period, ZEEV HECHTER delivered approximately $330,000 in cash to Moreno on behalf of

I.H., in return for Moreno's assurance that I.H.'s bids to purchase mortgage notes from GMAC would be successful.

    j. Between approximately 2006 and approximately 2014, ZEEV HECHTER invested at least approximately $500,000 in I.H.'s companies, and at times earned returns on his investment of approximately $18,000 to $35,000 per month.

All in violation of Title 18, United States Code, Section 371.

DATED: 9/19/2014

LAURA E. DUFFY
United States Attorney

EMILY W. ALLEN
Special Assistant U.S. Attorney